Pages 1 - 35

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

JOE HEMP'S FIRST HEMP BANK AND      )
DISTRIBUTION NETWORK, et al,        )
                                    )
            Plaintiffs.             )
                                    )
  VS.                               ) NO. C 15-5053 WHA
                                    )
CITY OF OAKLAND, et al,             )
                                    ) San Francisco, California
            Defendants.             ) Thursday
                                    ) January 28, 2016
_____) 8:00 a.m.


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

**For Plaintiffs:**          LEE & CHEN, LLP
                             1904 Franklin Street
                             Suite 415
                             Oakland, California 94612
                     **BY:  QUYNH M. CHEN, ESQ.**



**For Defendants:**          OAKLAND CITY ATTORNEY'S OFFICE
                             One Frank H. Ogawa Plaza
                             6th Floor
                             Oakland, California 94612
                     **BY:  JAMILAH A. JEFFERSON, ESQ.**




*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                Official Reporter - US District Court
                Computerized Transcription By Eclipse

1                                P R O C E E D I N G S

2   January 28, 2016                                          8:01 a.m.

3              THE COURT:  Civil 15-5053, Joe Hemp's First Hemp Bank

4   and Distribution Network versus City of Oakland.  Matter is on

5   for a motion hearing and case management conference.

6        Counsel, please come forward and state your appearance for

7   the record.

8              MS. CHEN:  Quynh Chen for plaintiff.

9              THE CLERK:  Okay.  Please come to the lectern.

10             THE COURT:  Say it again.

11             MS. CHEN:  Quynh Chen for plaintiff.

12             THE COURT:  Okay.  And over here?

13             MS. JEFFERSON:  Jamilah Jefferson for defendants.

14             THE COURT:  Thank you.  All right.

15       This is a motion to -- your motion to dismiss, right,

16   Ms. Jefferson?

17             MS. JEFFERSON:  Yes.

18             THE COURT:  Go ahead, please.

19             MS. JEFFERSON:  The city maintains that this Court

20   lacks jurisdiction over plaintiff's complaint.  Plaintiff is

21   arguing that our city ordinance is preempted by federal law and

22   that there is a conflict between the city ordinance and the

23   Controlled Substances Act.  And the city maintains that its

24   ordinance does not require plaintiffs to violate federal law

25   and there is no obstacle to the purpose of the CSA and, in

1  addition, the Fifth Amendment argument is premature.

2      And for those reasons, the city requests that the Court

3  dismiss the case.

4          **THE COURT:**  All right.  Let's hear from the

5  plaintiff -- plaintiffs.

6          **MS. CHEN:**  Thank you, your Honor.

7      The reason the city permit scheme is preempted is because

8  it requires and authorizes conduct that is prohibited by the

9  CSA.

10      In the motion to dismiss the cases cited are on

11  decriminalization laws, California's law to not prosecute

12  medical marijuana --

13          **THE COURT:**  Wait a minute.  Let me -- first let me

14  ask on this warehouse thing.

15          **MS. CHEN:**  Yes.

16          **THE COURT:**  I understand that the Controlled

17  Substances Act has an exemption or exception for warehousemen,

18  okay.  So that's fair enough.

19      Clarify this for me.  Is there a licensing scheme whereby

20  you apply to the federal government and get a license as a

21  warehouseman for -- for controlled substances?

22          **MS. CHEN:**  No.  The federal government doesn't have a

23  special program for warehouse exception licensing.

24      What they do have is a plain language of warehousing in

25  the course of business and paying taxes, taxes under the

1   warehouse tax I.D. number saying the warehousing business.

2             **THE COURT:**  All right.  So where is there -- there is

3   no federal right to be a warehouseman.  There is nothing that

4   says you have the right to apply to become a warehouseman and

5   once you are a federal warehouse, you get certain rights and

6   privileges.  There is nothing like that.

7       The statute just has an exception against going to

8   prison --

9             **MS. CHEN:**  That's correct.

10            **THE COURT:**  -- for those people who happen to be

11  going -- going to federal prison for those people who happen to

12  qualify as a warehouseman, but there is nothing in the law that

13  says you've got to be a warehouse.  There is nothing in the law

14  that says you must do it or gives you the right to do it.  It

15  just exempts those people.

16      So I don't see where you get any preemption there.

17            **MS. CHEN:**  Well, the current case isn't about whether

18  the warehouse is a federal right.

19      The current case is about whether this city ordinance and

20  an application of the city permit scheme is preempted by

21  federal law.

22      And the analysis for federal preemption is two ways.  One

23  way of finding federal preemption is if it's impossible to

24  comply with both federal and state and -- or, actually, or if

25  you could find that there is an obstacle preemption.

1          THE COURT:  Isn't it -- I mean, to me if we're going

2     to get into preemption, then the entire medical marijuana thing

3     should be thrown out as totally illegal under federal law.  If

4     we are going to go down the preemption route, then we ought to

5     be frank about it.

6          What your client is doing and what the City of Oakland is

7     doing is illegal all day long as anything under federal law.

8          MS. CHEN:  Under federal law -- that's not entirely

9     true, your Honor.  California law decriminalizes medical

10    marijuana.  That is not preempted.  And it's not preempted --

11         THE COURT:  Who says it's not?  It stands in the way

12    of the -- your whole point is anything that's an obstacle to

13    the achievement of federal law is preempted.

14         MS. CHEN:  Yes, but --

15         THE COURT:  So the whole medical marijuana scheme

16    stands as an obstacle to what Congress wanted to do.

17         MS. CHEN:  We want to differentiate between a

18    decriminalization law and an authorization law.  That is the

19    difference here.

20         California's medical marijuana does not authorize use of

21    medical marijuana, but this city permit scheme does.

22         THE COURT:  What?  Say that again.  California's law

23    what?

24         MS. CHEN:  Okay.  So the difference between -- so

25    it's not a blanket kill all laws regarding medical marijuana.

1  There is a difference between decriminalization versus

2  authorization.

3      In California -- the California laws under CUA and MMP,

4  they are voluntary programs that just says we're not going to

5  prosecute medical marijuana.

6      These city permit scheme makes itself very distinct and

7  separate from this California law because it's authorizing.

8  It's authorizing conduct as an obstacle to the CSA.  And it

9  does so if you look at the totality of the circumstances.

10      You could see that, one, the city, under their own

11  discretion, chooses eight large scale permit holders that are

12  exclusive.  Meaning, other collectives are collecting lawfully

13  under California law cannot opt out at all and can be punished

14  under this city's scheme.

15      Also, this permit scheme is used to shut down lawful

16  collectives to prevent competition and to -- to its own permit

17  holders, and the city directly profits millions of dollars off

18  the large scale enterprises.

19      Now, furthermore, the city on the application of the

20  permit says --

21          THE COURT:  Let me ask you -- you raise this point

22  about decriminalization versus authorization.

23          MS. CHEN:  Yes.

24          THE COURT:  So let me see if I've got this point.

25  Your point is -- and I'm not saying I agree with it.  I'm just

1   trying to repeat it.

2       Your point is that California law decriminalized medical

3   marijuana.  It didn't authorize it.

4           **MS. CHEN:**  No.

5           **THE COURT:**  It decriminalized it.

6           **MS. CHEN:**  Yes.

7           **THE COURT:**  But then you're saying the City of

8   Oakland comes along and authorizes it?

9           **MS. CHEN:**  That's correct.  Authorize and benefits

10  directly from it.

11          **THE COURT:**  So is that illegal under state law to --

12  under state law does the -- is what Oakland is doing illegal?

13          **MS. CHEN:**  That's a case that needs to be taken up as

14  well, but not in this case right here, in this motion to

15  dismiss.

16      We -- in order to see if it's a direct deposit of conflict

17  here we could look at the Congressional intent and the DOJ

18  memorandums to see what the purpose of the CSA.  And the DOJ

19  have written many memorandums saying that they are targeting

20  large scale enterprises in combination with ineffective local

21  regulation to prevent diversion of marijuana.  This is a DOJ

22  memorandum from 2013.

23      On top of that, the DOJ wrote a direct letter to the City

24  of Oakland saying that the permit scheme is an obstacle to the

25  CSA and even warning that it would prosecute those that would

1   warehouse pursuant to this city permit scheme.

2           **THE COURT:**  But they -- but it's not that the permit

3   scheme -- that letter was saying that what your client is doing

4   is illegal regardless of Oakland; that your -- that your

5   client's activity is illegal under federal law.

6           **MS. CHEN:**  I'm sorry?  It says in the letter --

7           **THE COURT:**  Let me see.  I think I've got it right

8   here.

9       It said:

10          "The department is carefully considering civil

11          and criminal legal remedies regarding those who seek

12          to set up industrial marijuana growing warehouses in

13          Oakland."

14      Isn't that what your client is doing?

15          **MS. CHEN:**  Well, the discretion to prosecute my

16  client; that's the DOJ discretion to do so.  They have written

17  memorandums with their top concerns being large scale

18  enterprises that cannot avoid diversion of marijuana.

19      Our internal services, we provide that service to prevent

20  these kind of diversion that they choose to target, but that is

21  not the matter in front of us today, whether or not the federal

22  government would prosecute that.

23      We're in court and admitting that we do this warehouse.

24  We are subject to the federal government prosecution.  We

25  understand this.

1       But the letter that the DOJ specifically wrote to the city

2  is saying that the Oakland ordinance creation of a licensing

3  scheme that permits large scale industrial marijuana is

4  contrary to federal law.  They are specifically saying it's the

5  city's large scale industrial marijuana.  It's the city's

6  scheme and how it is operating.

7              **THE COURT:**  Where is that letter in all these papers?

8              **MS. CHEN:**  Yes.  On the second page of that letter --

9              **THE COURT:**  Where can I find the letter?

10             **MS. CHEN:**  It's on the internet.  It's posted on

11  their -- the DOJ site.

12             **THE COURT:**  Do I have it in the paperwork here?

13             **MS. CHEN:**  I have a copy.  Would you like one?

14             **THE COURT:**  Yes.  If you don't mind.

15             **MS. CHEN:**  I don't mind.

16             **MS. JEFFERSON:**  Do you have another copy?

17             **MS. CHEN:**  I don't.  This is my one and only.

18         (Whereupon, document was tendered to the Court.)

19             **MS. CHEN:**  The portion that I'm quoting is

20  highlighted on the second page in red underlining.

21             **THE COURT:**  Okay.  I'm looking at a February 1, 2011

22  letter from Melinda Haag to John A. Russo, City Attorney.

23       All right.  So this was in response to his letter seeking

24  guidance from the Attorney General regarding the City of

25  Oakland Medical Cannabis Cultivation Ordinance.

1          So it goes through a number of paragraphs and then I think

2    this is the one you're referring to.  It says:

3          "The Department is concerned about the Oakland

4          ordinance's creation of a licensing scheme that

5          permits large scale industrial marijuana cultivation

6          and manufacturing as it authorizes conduct contrary

7          to federal law and threatens the federal government's

8          effort to regulate the possession, manufacturing and

9          trafficking of controlled substances.

10         "Accordingly, the department is carefully

11         considering civil and criminal legal remedies" -- it

12         looks like a typo -- "regarding those who seek to set

13         up industrial marijuana growing warehouses in Oakland

14         pursuant to licenses issued by the City of Oakland."

15         Well, I -- I recognize that this letter does express

16   concern about the ordinance, but the reason it expresses

17   concern about the ordinance is that it purports to authorize --

18              MS. CHEN:  Correct.

19              THE COURT:  -- activity that your client does, which

20   would be illegal under federal law.

21              MS. CHEN:  Not exactly, no, your Honor.  We actually

22   have in place a warehouse system that's safe to prevent

23   diversion of marijuana.

24         And in another memo that the DOJ -- DOJ issued --

25              THE COURT:  I'm assuming for the sake of argument --

1                **MS. CHEN:**  Yes.

2                **THE COURT:**  -- that what your client does is somehow

3    exempt under federal law?

4                **MS. CHEN:**  Okay.

5                **THE COURT:**  I'm not in any way saying that's true.

6    That's just what you keep telling me.

7                **MS. CHEN:**  Okay.

8                **THE COURT:**  But I have a suspicion that it's not

9    true, but that is for another day.  Right now I'm taking it at

10   face value that it's a warehouse.

11               **MS. CHEN:**  Okay.  Thank you, your Honor.

12               **THE COURT:**  So I still don't understand how that gets

13   you anywhere.  How does that preempt federal law -- I mean,

14   state law?

15               **MS. CHEN:**  The reason why the federal government --

16   I'm sorry, the federal law, CSA preempts this particular city

17   ordinance is because it requires and authorizes conduct as

18   prohibited by the CSA.  Just as simple as that.  We -- when it

19   authorizes such conduct, it is preempted as clear as day.

20        And how do you tell the difference between an authorizing

21   law and a law that just merely decriminalizes?  It's the

22   inability to opt out.  Okay.  It's the way that this permit

23   system is used to punish people who would otherwise be legal

24   under California law.

25               **THE COURT:**  What is it that the -- okay.  So tell me,

1   let's say that you're a warehouse and you are legal under

2   federal law as a warehouse.

3           **MS. CHEN:**  Okay.

4           **THE COURT:**  I'm just assuming that now.  I'm not

5   saying that.

6           **MS. CHEN:**  Okay.  Assumed, yes.

7           **THE COURT:**  But then what is it that the local

8   ordinance scheme makes you do that would -- that would

9   prevent -- would somehow put you in violation of the federal

10  law?

11          **MS. CHEN:**  So although you could find preemption

12  under impossibility or under obstacle, under impossibility

13  argument where it's impossible to comply with both state and

14  federal law, the answer to that question is it requires -- the

15  city scheme requires, one, to give lab samples to a lab to be

16  tested.  Also, it requires conspiracy, aiding and abetting, and

17  use of income in violation of the CSA.

18          **THE COURT:**  Let's pause on the lab for a moment.

19          **MS. CHEN:**  Uh-huh.

20          **THE COURT:**  Does the ordinance say that the lab has

21  to do it on their premises?  Can't the lab just come to your

22  premises and do the testing right there?

23          **MS. CHEN:**  It says in the ordinance that it has to be

24  tested by an independent laboratory.  The way collectives --

25          **THE COURT:**  Can't the independent come to your

1  premises and do the testing right there?

2             MS. CHEN:  No.

3             THE COURT:  Where -- where does it say that in the

4  pleading?

5             MS. CHEN:  I mean, even -- the ordinance does not

6  specifically says where the testing shall be done.

7       However, the federal CSA does not allow non-members to

8  touch this medical marijuana.  Regardless of where you're at,

9  it doesn't matter.

10      A non-member in a closed regulatory system -- a non-member

11 is outside of this closed regulatory system, so any third

12 party, any third party should not be touching this medical

13 marijuana.

14            THE COURT:  But your warehouse people, don't they

15 deliver to the -- the dispensaries that are illegal under

16 federal law?

17            MS. CHEN:  What do you mean, your Honor?

18            THE COURT:  Well, there is marijuana in your

19 warehouse, right?

20            MS. CHEN:  Yes.

21            THE COURT:  Where does it go?  Where does that

22 marijuana wind up?

23            MS. CHEN:  With members.  Members to members.

24            THE COURT:  Members.  And what is a member?

25            MS. CHEN:  A person that has a recommendation from a

1    doctor saying that they have a right to medical marijuana.

2            **THE COURT:**  So an individual.

3            **MS. CHEN:**  An individual.

4            **THE COURT:**  All right.  So when that individual comes

5    to collect some marijuana, somebody is handing it over to them,

6    right?

7            **MS. CHEN:**  A member, yes.

8            **THE COURT:**  To a member.

9            **MS. CHEN:**  Yes.

10           **THE COURT:**  Okay.  So isn't that a -- isn't that

11   just -- why isn't that illegal under federal law?

12           **MS. CHEN:**  It's member to member.  The person handing

13   the -- the working person is a member and the person receiving

14   is also a member.

15       As a collective, it's just two people; both being an

16   individual with a recommendation from the doctor sharing,

17   sharing.

18           **THE COURT:**  That's a transfer, isn't it?

19           **MS. CHEN:**  From member to member it's still defined

20   within the closed regulatory.  Closed.  "Closed" meaning it's

21   member to member.  No third parties.  No independent

22   laboratory.  No independent anyone outside of this closed

23   regulatory system?

24           **THE COURT:**  And that's a federal definition?

25           **MS. CHEN:**  Yes, I believe so.

1          **THE COURT:**  Where did you get that definition?

2      I'm amazed to hear that the federal law somehow blesses

3  this member-to-member warehouse thing that you're describing.

4      Show me the regulation that sets that up or the guidance

5  or memo.  Something from the feds that blesses that.

6          **MS. CHEN:**  Your Honor, if I may, I would like to have

7  an opportunity submit this in a document later proving that

8  there is such a thing as a closed regulatory system.

9      But at this time, at this motion to dismiss hearing, I

10  would like to address whether or not the city ordinance is

11  preempted by the federal government and whether or not that

12  applying for this permit is a self-incriminatory act under the

13  fifth amendment.

14          **THE COURT:**  Okay.  Hold that thought for a minute.

15  Let me go back to Ms. Jefferson.

16      Ms. Jefferson, I'm trying to understand better what's

17  going on here.  She says it's a warehouse.  You say it's a

18  dispensary.  Maybe those aren't inconsistent.  But how does

19  this -- how do these -- how does the Joe Hemp thing work?

20          **MS. JEFFERSON:**  Well, I'm -- I'm willing to concede

21  how the actual operation works as far as what plaintiff has

22  suggested.

23      The city's ordinance simply defines what it is attempting

24  to regulate.  And what it's attempting to regulate is four or

25  more people who come together and use medical marijuana as a

1  collective.

2      And so if plaintiffs say that they are a warehouse and

3  they meet that definition, whatever the definition may be, and

4  they are exempt under federal law, the city has no issue with

5  that.  The city doesn't take issue with that.

6      And the city's ordinance could define "dispensary" as

7  anything.  It can call it a dispensary.  The city could have

8  called it, you know, a business housing medical marijuana.  The

9  title does not matter.

10      If plaintiffs are exempt or meet the exception under

11  federal law, that's fine, but they also come within the

12  definition of the city's ordinance.  It doesn't change that

13  they may be exempt under federal law.  It just means that for

14  the city's purposes and for the city's regulation --

15          **THE COURT:**  I think I understand that point.

16          **MS. JEFFERSON:**  Okay.

17          **THE COURT:**  But then counsel, Ms. Chen says:  Well,

18  but you're ignoring the fact that you make them go get tested

19  by an independent lab and in order to test by an independent

20  lab she says they have to make a, quote, transfer, which would

21  be illegal under federal law.

22      So what do you say to that point?

23          **MS. JEFFERSON:**  Well, the only definition that the

24  city is aware of for distribution -- and that's plaintiff's

25  argument -- that the city's ordinance requires distribution and

1   that's prohibited under federal law.

2       The definition for distribution includes delivery.  It

3   doesn't -- the city's ordinance does not require any such

4   delivery.  An independent person can come onto the premises.

5   There doesn't have to be an exchange of marijuana between this

6   independent person and the collective.

7       And to the extent that plaintiff continues to argue that

8   that is somehow in conflict, it's not in conflict with the

9   general spirit and purpose of the CSA, which is to protect the

10  health and safety of citizens.

11          **THE COURT:**  Give me the names of some of these

12  independent drug testers.

13          **MS. JEFFERSON:**  I don't have names, your Honor.

14          **THE COURT:**  Do they even exist?

15          **MS. JEFFERSON:**  The independent laboratories?

16          **THE COURT:**  Yes.

17          **MS. JEFFERSON:**  Presumably, they exist.  I'm not

18  prepared with specific names of the laboratories.

19      But the regulations do not require distribution.  The

20  regulations do not require delivery.  They don't use those

21  words.

22      I cited or quoted to it in the reply, and the section that

23  plaintiffs are referring to makes no mention of anything that

24  would run afoul to the prohibitions in the CSA.

25          **THE COURT:**  All right.  So show me in the pleading --

1          **MS. CHEN:**  Yes.  I'm sorry, your Honor?

2          **THE COURT:**  In the amended complaint where are the

3   allegations that deal with the laboratory?

4          **MS. CHEN:**  Okay.  You're talking about the amended

5   complaint or my response to the motion to dismiss?

6          **THE COURT:**  No.  The amended complaint.

7          **MS. CHEN:**  Okay.

8      (Brief pause.)

9          **MS. CHEN:**  Okay.  On Amended Complaint 25 to 26, this

10   is the transfer.

11      By the way, your Honor, it doesn't matter if you send it

12   out, mail it out or if someone comes to the store and picks it

13   up, it's still a transfer under the CSA.

14      I understand that previously you had an example of what if

15   the laboratory came to you.  Transferring from one person to

16   another person is still a transfer.

17          **THE COURT:**  Well, can you give me a citation to

18   something -- some decision that says transfer for purposes of

19   lab testing constitutes a transfer under the CSA?

20          **MS. CHEN:**  Well, the definition of a transfer is

21   defined in the CSA 8028.  Well, I mean -- I'm sorry.

22      The delivery 80211 and the 8028 defines delivery and

23   transfer just to pass it to someone, one can interpret.

24      But the cases that we have regarding medical marijuana and

25   city ordinances is -- the only case we have is *Pack*, which is

1    an appellate court case in the California courts.  And the *Pack*

2    case says that it's impossible to comply with this provision

3    without violating the CSA, because it's a transfer when you

4    send to it a lab.

5        But even if you don't find that it's --

6            **THE COURT:**  What's the citation to that decision?

7            **MS. CHEN:**  The citation is *Pack v Superior Court*.

8    It's 132 Cal Reporter 3d633.

9            **THE COURT:**  Cal Reporter, what?

10           **MS. CHEN:**  Say again?  I'm sorry.

11           **THE COURT:**  I've got it right here.

12       (Whereupon, document was tendered to the Court.)

13           **THE COURT:**  What page do I look at?

14           **MS. CHEN:**  On Page 8 -- I'm sorry, 20.

15           **THE COURT:**  I see something called "Conflict

16   Preemption."  Is that what you're talking about?

17           **MS. CHEN:**  Yes.  In "Conflict Preemption," yes.

18   Sorry.

19       (Brief pause.)

20           **THE COURT:**  I want to go back to why you're a

21   warehouse to begin with.  Where does this marijuana come from?

22           **MS. CHEN:**  Where does the marijuana come from?  It

23   comes from a member.  A member has it.

24           **THE COURT:**  One member?

25           **MS. CHEN:**  Well, it starts with one member.  Of

```
 1  course, right now it's not one member.  Right now it's a
 2  collective of members.
 3      But it started necessarily with one member who had a plant
 4  under medical marijuana, and then he shared it with another
 5  member, who also is -- has that medical marijuana right in
 6  California.  It became a collective of members over time.
 7          THE COURT:  But isn't that distribution right there?
 8          MS. CHEN:  Well, the -- see, for the individuals,
 9  whether they distribute it, that's one thing.  But this First
10  Hemp Bank is providing a service now, after so many
11  collectives -- members in this collective have congregated.
12  They provide a service that just helps them store and transfer
13  this medical marijuana between members.  So the service is just
14  to hold and transfer.
15          THE COURT:  Well, but it's going -- somebody who
16  never grows any marijuana is a member and can get marijuana
17  from the warehouse, right?
18          MS. CHEN:  If he -- if that person has -- is a member
19  and has medical marijuana, then, yes, he can obtain a certain
20  small amount, yes.
21          THE COURT:  And then they pay somebody for that?
22          MS. CHEN:  Just for the service of, like,
23  administrative fees actually, not for the marijuana itself.
24      But if we're assuming that the warehouse exception
25  applies, I don't understand what you're asking actually.
```

 1          **THE COURT:**  It didn't sound like a warehouse to me.

 2    It sounds like a sham to get around the -- try to get around

 3    the Controlled Substances Act.

 4          Here is the way I see this working.  One or more members,

 5    usually just a small number of members grow the marijuana,

 6    bring it to the store, which is not called the warehouse, but

 7    it's called Joe Hemp.

 8          **MS. CHEN:**  Joe Hemp's First Hemp Bank.

 9          **THE COURT:**  Joe Hemp's First Hemp Bank and

10    Distribution Network.  Right there in the title of it it says

11    "distribution."

12          **MS. CHEN:**  Right.

13          **THE COURT:**  So then they have a pile of marijuana

14    there.  Somebody comes in with a medical marijuana

15    prescription, pays "X" dollars, and walks away with their

16    supply for the next few days of marijuana and they dress it up

17    by saying:  We're a member of the collective.  We're a member

18    of the warehouse.

19          You know, that's just a sham.  It's a sham.  Maybe it's

20    okay under state law.  I'm not saying it's a sham under state

21    law, but it's a sham to say that somehow is a warehouse.

22          **MS. CHEN:**  First Hemp Bank has been operating for

23    about a decade, paying federal taxes.  The federal government

24    is aware and it's their discretion to prosecute our defendant.

25          In this case in particular they have not -- we have not,

1  this plaintiff has not been prosecuted after almost a decade.

2  Yet, we're here today not because of whether or not we're a

3  warehouse exactly.  We're here because the city permit scheme

4  is preempted.  That's the question at the table, isn't it?

5           **THE COURT:**  That is one of the questions.

6           **MS. CHEN:**  Okay, okay.

7           **THE COURT:**  Of course, I agree that you're trying to

8  raise that question, but what troubles me is that your entire

9  operation is illegal under a law passed by Congress.

10      Now, look.  It's not my personal opinion.  I think -- my

11  personal opinion is that the marijuana laws ought to be

12  changed.  That's -- but I took an oath to uphold the law.  I

13  can't just override -- I know you're a true believer.  You

14  probably believe that all these laws are crazy and ought to be

15  overridden, but that's not me.  I've taken an oath to uphold

16  the law.

17      So the problem I've got is here is a sham operation that

18  is illegal under federal law.  Yeah, they don't prosecute you

19  because it's small potatoes compared to terrorists.  Compared

20  to big time heroin dealers and all -- they don't have enough

21  cops to go around as it is, so they've got to -- they can't

22  prosecute you without giving up on the terrorists.  So you

23  skate by.  Well, all right.  That's -- good for you, you skate

24  by.

25      Just in the same way many, many people who are here

1  illegally in this country, they get to skate by, too, because

2  we don't have the resources to deport everybody.

3       So, but it doesn't mean that it's lawful.  It just means

4  that it's not being prosecuted, and that's not the same thing.

5  And what troubled me is you're asking me to use the power of a

6  federal court to benefit a sham operation that is illegal under

7  federal law.

8            **MS. CHEN:**  We are not asking the Court to benefit us,

9  to give us any benefit as -- although we assume that this is a

10  warehouse and we assume that we will deal with the question as

11  to whether it's a warehouse in another case -- or another time,

12  that is.

13       But even under that assumption, I have to say that we are

14  just asking the Court to look at the city permit scheme and see

15  if it does not take it to a whole new level of authorization

16  and to monopolizing the money in the city, into shutting down

17  collectives where the purpose is non-profit and, yes, small

18  scale.

19       Whether or not we're skating by when the federal

20  government chooses to not prosecute -- not just skating by, but

21  chooses not to prosecute because we follow their guidelines.

22  Now, that's a possibility, too, that we are following their

23  guidelines and they are choosing not to prosecute us after a

24  decade of openly publicly talking to the federal government.

25       So, I mean, the assumption that we're stating by is not

1  necessary.

2      The fact that the city permit scheme -- and not all of

3  California medical marijuana.  There is many memos talking

4  about how the federal government works hand-in-hand with the

5  California government to prosecute or not prosecute, and that

6  their focus specifically is large scale enterprises where there

7  are poor local regulations to prevent diversion.

8      We have the focus on the Congressional intent, the DOJ

9  intent, and their idea -- their idea of what's an obstacle to

10  the CSA, because it's their job, who to prosecute.  Their

11  intent, their statement of what is an obstacle.  And they have

12  clearly stated that city permit is an obstacle in a specific

13  direct letter to the City of Oakland.

14      Now, I don't know how much more clearly to say, when the

15  city has written a letter that says:  You're authorizing

16  conduct and that we don't like the city permit and that is an

17  obstacle.  It's an obstacle.  The city permit is an obstacle to

18  the CSA and how they enforce the CSA.  That is proof and

19  evidence that it is authorizing conduct that is an obstacle

20  already and under federal law that should be preempted.

21          **THE COURT:**  What this letter is not talking about,

22  the independent lab scheme.  It doesn't even mention that.

23          **MS. CHEN:**  No.

24          **THE COURT:**  It's talking about the very fact that

25  these warehouses exist to begin with.

1          **MS. CHEN:**   No.   It's talking about the city permit

2  scheme creating a situation that's an obstacle to their

3  enforcement of the CSA.

4      There's two ways to reach preemption.   One impossibility.

5  And, two, authorizing being an obstacle.   And that letter is

6  100 percent evidence that it is authorizing conduct, and it is

7  an obstacle to the CSA.   That fulfills preemption.

8      We can also use the impossibility argument using the

9  sending it to the laboratory as an evidence that it is

10 impossible.   But either one, impossible or obstacle analysis,

11 you can still find preemption.

12          **THE COURT:**   All right.   A somewhat related question.

13 You gave me this decision, *Pack v Superior Court*.   And it does

14 deal with preemption.

15      Have you brought a state court action to raise the same

16 issue?

17          **MS. CHEN:**   No.   A state court was not filed.

18          **THE COURT:**   See, here is one difference between a

19 federal court -- see, a federal court has the problem I have,

20 which is you're asking the Court to grant relief as a federal

21 court to an outfit that's in violation of federal law to begin

22 with.   But under state law you don't have that problem, so I

23 could imagine that a state court judge, not having that

24 problem, might be more sympathetic and might grant the relief

25 that you're talking about, about the -- at least the

1  independent lab.

2      That's as far as I'm going.  If it really is true that

3  they -- that it is a transfer.  I don't know that it's a

4  transfer, but, but at least that's what Judge Croskey said, and

5  he's a very respected judge.

6      How do you deal with Judge Croskey's opinion,

7  Ms. Jefferson?

8          **MS. JEFFERSON:**  Well, the city recognizes that the

9  opinion exists and that the judge considered a scheme similar

10  to the city's, but at this point he, as your Honor recognizes,

11  it's not binding on the Court.  It's one judge's opinion of one

12  city's ordinance.  And there are other Court of Appeal

13  decisions that do not find that state law, for example, is

14  preempted by federal law and the city's ordinance is --

15          **THE COURT:**  Is there one going the other way on the

16  lab point?

17          **MS. JEFFERSON:**  I'm not aware of another decision

18  discussing the laboratory.

19          **THE COURT:**  All right.  I'm going to bring it to an

20  end.  I don't have an answer for you.  I'm not going to have

21  a -- do the case management part until I decide whether or not

22  we're going to keep the case in court.

23          **MS. CHEN:**  May I point out something, your Honor?

24          **THE COURT:**  Sure.

25          **MS. CHEN:**  This case has three causes of action,

1   including the Fifth Amendment right against self-incrimination,

2   and that wasn't brought up in the motion to dismiss.

3           THE COURT:  That was what?

4           MS. CHEN:  That was not brought up in the motion to

5   dismiss.

6           MS. JEFFERSON:  Well, in the initial motion to

7   dismiss the self-incrimination wasn't a part of the complaint,

8   but in the reply once the amended complaint was filed, your

9   Honor asked if we were going to move forward with the motion to

10  dismiss that we had already filed.  We agreed because, in

11  essence, it's the same.  She adds a few allegations, but the

12  material allegations are the same.  So we address that in the

13  reply.

14          THE COURT:  Did you -- have you had a chance to

15  address what they said in the reply?

16          MS. CHEN:  Here?

17          THE COURT:  In writing.

18          MS. CHEN:  In writing?  No.  After the reply --

19          THE COURT:  Then I think you should have a chance to

20  do that.  When can you -- can you give me your reply to the

21  reply on the Fifth Amendment only by Monday?

22          MS. CHEN:  Monday sounds good.  Yes.

23          THE COURT:  Monday at 5:00 o'clock.

24          MS. JEFFERSON:  Are we able to address -- your Honor,

25  if you are inclined to give her an opportunity to respond in

1  writing, I understand.  Are we able to address it?  The city's

2  argument is pretty simple.

3       **THE COURT:**  I'm still going to give her a chance to

4  address it in writing since you raised it.  I understand why.

5  It's a good reason.

6       But you tell me -- each of you have get a minute or so on

7  this, on the Fifth Amendment.  Go ahead.

8       **MS. JEFFERSON:**  Sure.

9       To the extent I understand her argument on the Fifth

10 Amendment self-incrimination, the city's position is just as it

11 relates to what we argued before; that they may be a federal

12 warehouse.  They can continue to be a federal warehouse.  The

13 city has no issue with that.

14      Simply complying with our permit scheme and recognizing

15 that they fall within the definition is not incriminating as

16 far as federal law is concerned.

17      Our ordinance includes -- or states:

18           "A dispensary shall mean a collective or a

19           cooperative that distributes, dispenses, stores,

20           exchanges, processes, delivers, makes available,

21           transmits or gives away marijuana."

22      So to the extent they fall within that definition does not

23 necessarily mean that they are a distributor for purposes of

24 federal law, and so the city doesn't see any issue with

25 self-incrimination.

 1          THE COURT:  Where did you get all those verbs?

 2          MS. JEFFERSON:  I'm sorry.  This is in the city's

 3 ordinance cited in the moving papers.

 4          THE COURT:  What do you say, Ms. Chen, about the fact

 5 that it's not necessarily an admission that you are violating

 6 federal law?

 7          MS. CHEN:  When you fill out the application -- well,

 8 keep in mind that you cannot opt out.  We claim to be a

 9 warehouse, yes.  We cannot opt out.  We're getting punished for

10 attempting to opt out.  So there is no opting out.

11     We have to fill out a permit application, to at least

12 apply for a permit.  And on the permit application itself the

13 amended complaint, Exhibit A, you'll see a copy of an

14 application.  At the very end, at the very end you'll see that

15 it says:  You are violating federal law.

16     Basically it says:

17          "You are violating federal law and permittees

18      agrees to indemnify and save harmless the City of

19      Oakland."

20          THE COURT:  So where does it say you're violating

21 federal law?  Is this it right here (indicating)?  I'm holding

22 up the page I think you're referring to.  Is this it?

23          MS. CHEN:  I can't see that far, I'm sorry.

24          THE COURT:  It says:

25          "As you know, the cultivation, possession,

1           distribution and sale of any type of cannabis,

2           including medical cannabis, is prohibited under

3           federal law.  A dispensary permit issued by the City

4           of Oakland does not provide any immunities or

5           defenses."

6       I don't understand how that is some kind of -- why is it

7   that you are admitting to anything by applying?  That's just --

8   that's the city talking, not you talking.

9           MS. CHEN:  When you sign an application agreeing to

10  all the terms of this application and understanding that it's

11  called dispensary permit -- that is, a medical marijuana

12  dispensary permit -- and you sign and date it.  Isn't it the

13  same as saying that you are a medical dispensary?

14          THE COURT:  Is the permit application form here in

15  the record somewhere?

16          MS. CHEN:  It's in the TRO judicial notice.

17          THE COURT:  Can you hand up that -- something that I

18  can see what the -- what it is that you have to sign?

19          MS. CHEN:  I think you have it, that document.  The

20  page that you held up, that was basically it.

21          THE COURT:  I don't see anything you sign.  There is

22  nothing on here to sign.

23          MS. CHEN:  Oh, yes.  Yes, yes, yes.  That's -- the

24  page right after that is the signature page.  If I could hand

25  this up.

1          THE COURT:  My law clerk didn't copy that, so I need

2   to see it.

3       (Whereupon, document was tendered to the Court.)

4          THE COURT:  So this, this is the signature page here?

5          MS. CHEN:  That's correct.

6          THE COURT:  All right.

7       (Brief pause.)

8          THE COURT:  Where does the application begin?

9          MS. CHEN:  At Exhibit A.  Just -- at the end of the

10  amendment, Exhibit A.  That's where it starts.  That's the

11  application.

12      I have the rules here, too, if you'd like to see it.

13         THE COURT:  Well, is this it where it starts:

14         "Administrative regulations and performance

15      standards."

16         MS. CHEN:  I believe so.

17         THE COURT:  Is that the application?

18         MS. CHEN:  I believe so.

19         MS. JEFFERSON:  On the amended complaint there is a

20  cover page, your Honor, that's right after Exhibit A, which is

21  perhaps what you're looking for.  It looks like this

22  (indicating).

23      Do you have that?

24         MS. CHEN:  It should be, yes.

25         THE COURT:  It says "Special Activity Permit."

1          MS. CHEN:  Yes.  Sorry, I'm not wearing glasses.

2          THE COURT:  For Oakland Cannabis Institute, Donna

3    Frank.  Are they involved in our case, or is this just an

4    exemplar?

5          MS. CHEN:  This is a permit that was issued in 2013

6    and that's the application.

7          THE COURT:  To one of the plaintiffs in our case?

8          MS. CHEN:  I'm sorry.  No, no, no.  That's not a

9    party.  That's not a party.

10          THE COURT:  So this is just an example of one?

11          MS. CHEN:  Yes.  That was just an example of one.

12    Plaintiffs never received a permit.  We did not want to apply

13    for the reason of having to admit, too.

14          THE COURT:  All right.  So I'm looking at all this

15    verbiage and it does refer to dispensary.  Where is dispensary

16    defined here?

17          MS. JEFFERSON:  It's defined in the actual ordinance.

18          THE COURT:  Read to me what it says.

19          MS. JEFFERSON:  You want me to --

20          THE COURT:  You read it to me a minute ago.

21          MS. JEFFERSON:  Yes.  I'm sorry.

22          THE COURT:  Slowly.

23          MS. JEFFERSON:  (As read)

24          "Cannabis dispensary, in quotes, or dispensary,

25       in quotes, shall mean a collective or a cooperative

1      that distributes, dispenses, stores, exchanges,

2      processes, delivers, makes available, transmits,

3      and/or gives away marijuana in the city for medicinal

4      purposes for four or more qualified patients and/or

5      primary caregivers pursuant to California Health and

6      Safety Code Section 11362.5."

7      **THE COURT:**  All right.  So it says somebody who just

8  stores it --

9      **MS. JEFFERSON:**  Right, exactly.

10      **THE COURT:**  -- is a dispensary.

11    So that could be a warehouse.  I don't see how there is

12  any conflict there.

13    But so which -- which is the part of this -- all these

14  long paragraphs, Ms. Chen, that you think is a -- an admission

15  of criminal activity such that the Fifth Amendment would apply?

16      **MS. CHEN:**  Because there is so much DOJ notices,

17  memorandums and prosecution of city permit holders, an

18  indication that the city permit scheme itself is contrary to

19  the law, applying to the city permit scheme in entirety, even

20  applying to the city permit scheme is basically saying:  I want

21  to be a part of the city permit scheme.

22    And we are alleging that the city permit scheme is

23  preempted by the federal law.  So by saying that we're a part

24  of this scheme that's self-incrimination.  Admitting that we

25  fall under the city permit scheme that is unlawful under

1  federal law.  City permit holders are being prosecuted.

2  Harborside, for example, is being prosecuted --

3          THE COURT:  If you're correct that you're a

4  warehouse, then you won't be prosecuted.  So --

5          MS. CHEN:  So, for example, Oaksterdam, another

6  permit holder, is being raided by the DOJ continuously.  Just

7  purely by having a permit subjects you to be targeted by the

8  DOJ, for example.  Like I said, Oaksterdam.  It's flagging the

9  Department of Justice.

10         THE COURT:  All right.  Okay.  I still want to give

11 you an opportunity by noon on Monday to submit up to five

12 pages, Ms. Chen, on the issue of the Fifth Amendment.

13         CHEN:  Okay.  Thank you, your Honor.

14         THE COURT:  All right.  We will leave it at that and

15 I'll call you back in, depending on how this comes out, as to

16 whether or not we have a case management conference or not.

17         MS. JEFFERSON:  And, your Honor, just so I'm clear

18 the city won't be responding to her five page --

19         THE COURT:  Do you want to respond?  I'll give you

20 til the next day.  You can submit up to five pages by noon.

21         MS. JEFFERSON:  I'm not sure that I need to, but I

22 just wanted to clarify.

23         THE COURT:  You have to do it by the next day at

24 noon.  Monday for the plaintiff.  Tuesday at noon for you.

25         MS. JEFFERSON:  Is there a time deadline for Monday?

```
 1            THE COURT:  Yes, at noon.

 2            MS. JEFFERSON:  I'm sorry.  Thank you.

 3            MS. CHEN:  Thank you, your Honor.

 4            THE COURT:  So I like noon.  Otherwise, it winds up

 5  being midnight.

 6            MS. JEFFERSON:  I understand.

 7            THE COURT:  Okay.  Thank you very much.

 8            MS. CHEN:  Thank you.

 9       (Proceedings adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## <u>CERTIFICATE OF OFFICIAL REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_Debra L. Pas_
_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Wednesday, February 17, 2016